IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. BRYAN HENDERSHOT, an individual f/d/b/a BOARDWALK DISTRIBUTION COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>1. SOUTHERN GLAZER'S WINE AND SPIRITS OF OKLAHOMA, LLLP d/b/a JARBOE SALES COMPANY;<br>2. CENTRAL LIQUOR COMPANY, L.P. d/b/a RNDC OKLAHOMA;<br>3. BEST BRANDS OF DELAWARE, L.L.C. d/b/a REPUBLIC NATIONAL DISTRIBUTING COMPANY;  and<br>4. BRIAN LIDJL, an individual d/b/a SOUTHERN GLAZER'S WINE & SPIRITS OF OKLAHOMA,<br><br>    Defendants. | Case No. 20-CV-652 CVE CDL<br><br>Jury Trial Demanded<br>No Prior Cases |

## COMPLAINT

Plaintiff, Bryan Hendershot ("Hendershot"), for his claim for relief against the Defendants, alleges and states:

**Parties, Their Backgrounds, and Associated Entities**

1. Plaintiff, Hendershot, is a resident of Tulsa, Oklahoma. He formerly owned and operated Boardwalk Distribution Company ("Boardwalk"), a sole proprietorship in Tulsa that was a distributor of wine, spirits and beer to retailers in Oklahoma. Through the passage of an amendment to the Oklahoma Constitution referred to herein as "28A," and its full implementation that authorized brands of spirits and wine to sell only to one distributor as of October 1, 2018 (the "Kickoff Date"), the Defendants, two of whom were direct horizontal competitors of Boardwalk, succeeded in conspiring and creating a group boycott of Boardwalk. This caused Hendershot to

suffer a loss of at least $22 million. Given this loss, Hendershot sold the assets of Boardwalk in mid-2020, but remained obligated on Boardwalk's debt, and retained his claims herein. Eventually, Boardwalk ceased to function.

2. As of January 1, 2015, two dominant distributors of wine and spirits in sales and enterprise value existed in Oklahoma. They were Central Liquor Company LP ("Central") based in Oklahoma City, and Jarboe Sales Company ("Jarboe") based in Tulsa. Jarboe's and Central's corporate evolution and associations prior to 28A, and after, involved the Defendants, all of whom are conspirators in bringing about the group boycott, and other anticompetitive effects described herein.

3. Defendant, Southern Glazer's Wine & Spirits of Oklahoma, LLLP d/b/a Jarboe Sales Company ("Southern-Jarboe"), is an Oklahoma limited liability limited partnership resulting from Southern Glazer's Wines & Spirits, Inc.'s purchase of what is believed to be a 49% interest in Jarboe that was formalized on the Kickoff Date - a purchase authorized by 28A. Prior to that date, Jarboe, as a distributor of wine and spirits in Oklahoma, played a central role as further alleged herein in the passage of 28A, and was active in promoting and securing brands of wine and spirits to sell only to it in the State of Oklahoma after the Kickoff Date. Through its charter and wine and spirits sales in Oklahoma, Southern-Jarboe has contacts in Oklahoma, and specifically in the Northern Judicial District of Oklahoma that warrant the exercise by this Court of its jurisdiction over it.

4. The purchase of an interest in Jarboe on the Kickoff Date had its origins with Southern Wine & Spirits of America ("Southern"). It was a national alcohol distributing entity up to 2016. In that year, Southern merged with Glazer's Wine and Spirits ("Glazer's"), another national distributor of alcohol, and the two became Southern Glazer's Wine and Spirits, Inc. ("Southern

Glazer's", a "National Distributor"). Southern Glazer's after the Kickoff Date was a source of brands of wine and spirits to sell only to Southern-Jarboe after the Kickoff Date.

5. Central on the Kickoff Date became Defendant, Central Liquor Company L.P. d/b/a RNDC Oklahoma ("Republic-Central"), an Oklahoma limited partnership entity. It resulted from Republic National Distributing Company LLC's purchase of a 49% interest in Central on the Kickoff Date - another purchase authorized by 28A. Prior to that date, Central played a primary role in the passage of 28A, and was active in promoting and securing brands of wine and spirits to sell only to it, and then to Republic-Central after the Kickoff Date. Through its partnership charter and sales in Oklahoma, Republic-Central has substantial jurisdictional contacts in the Northern Judicial District of Oklahoma that enable this Court to exert its jurisdiction over it.

6. The purchaser of an interest in Central, Republic National Distributing Company, LLC ("Republic"), is a National Distributor that was a source of brands of wine and spirits to sell only to Republic-Central after the Kickoff Date.

7. The National Distributors, as well as brands of wine and spirits, prior to and after the Kickoff Date, were required by law in Oklahoma to have Oklahoma resident agents, referred to as a non-resident seller (hereafter, "NRS"), that were required to secure a license in Oklahoma and then to serve as pass through entities for sales of wine and spirits into Oklahoma. The specific NRS Defendants are identified below.

8. Brian Lidjl d/b/a Southern Glazer's Wine & Spirits of Oklahoma ("Southern NRS"), was the non-resident seller to Jarboe prior to the Kickoff Date, and after it to Southern-Jarboe. On information and belief, he, directly or indirectly, played a role in the passage of 28A, and was active in promoting and securing brands prior to and after the Kickoff Date to sell wine and spirits only to Jarboe and then to Southern-Jarboe. Through his licensing and sales activity in Oklahoma, he has

3

jurisdictional contacts in the Northern Judicial District of Oklahoma that enable this Court to exert its jurisdiction over him.

9. Best Brands of Delaware, LLC, d/b/a Republic National Distributing Company ("Republic NRS") was and is the non-resident seller in Oklahoma to Central and then to Republic Central after the Kickoff Date. Republic NRS is 50% owned by the Naifeh Family Trust of Oklahoma City, and 50% owned by Republic. It was active in promoting the passage of 28A, and prior to and after the Kickoff Date in promoting and securing brands of wine and spirits to sell only to Central and then to Republic-Central in Oklahoma. Through its licensing in Oklahoma, sales of wine and spirits in Oklahoma and other business contacts, it has substantial jurisdictional contacts in the Northern Judicial District of Oklahoma that enable this Court to exert its jurisdiction over it.

### Jurisdiction and Venue

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 26.

### General Allegations

**A.     The Competitive System In Oklahoma for Distribution of Alcohol.**

11. A three-tier system for distribution of alcohol arose by legislation in Oklahoma after the repeal of Prohibition in 1959. This and the business activities related thereto are hereafter referred to as the "Competitive System." The Competitive System existed in Oklahoma until the Kickoff Date.

12. 28A displaced the Competitive System. The three tiers of the wine and spirits markets under the Competitive System were (1) the brand or manufacturer, *e.g.*, distiller, winemaker etc., (the "Brand"), (2) distributor or wholesaler, and (3) retailer, *e.g.*, liquor stores. This structure

4

was maintained by law that required distributors to be sole proprietors and residents of Oklahoma. This prohibited any out of state ownership of a distributor. A basic legal tenant of the Competitive System was that Brands had to sell their wine and spirits to **all** the distributors in Oklahoma at the same price, thereby insuring competition among the distributors in their sales to retailers. The distributors acted as wholesalers, and sold wine and spirits to retailers. Only retailers could sell to consumers.

### B.    Boardwalk's Competition with Central and Jarboe Under the Competitive the System and its Impact.

13.    Until the Kickoff Date, Oklahoma law required that Brands sell to every distributor in the state at the same price. This allowed entrance to the Oklahoma market place for competitive distributors, but the size of Central and Jarboe made a successful new entry by a multi-brand distributor very difficult. Central and Jarboe had sufficient size and relationships to access all Brands, warehouse them, and have a fleet of trucks to distribute them. This prevented any major competitive challenge to either of them until Boardwalk emerged.

14.    In 2015, Boardwalk began to rise as a substantial competitor of Central and Jarboe. This occurred largely though Boardwalk's increased services to liquor stores, including deliveries everyday to any retailer in the state, and a willingness to receive orders late in the day. These services exceeded those offered by Central and Jarboe.

15.    Boardwalk's competitiveness was shown in its realized and increasing sales revenues:

| | |
|---|---|
| 2014 | $22.5 million |
| 2015 | $36.6 million |
| 2016 | $67.4 million |
| 2017 | $97.6 million |

16.    A large portion of Boardwalk's sales were reflected in declining sales of its two major horizontal competitors: Central and Jarboe. The increasingly tough competition from Boardwalk

eroded the enterprise value of each of Central and of Jarboe, and threatened more erosion in the future to the extent that it threatened the market dominance of Central and Jarboe. Brad Naifeh, an owner of Central, acknowledged this when at lunch with Hendershot he handed Hendershot a note that said, if Boardwalk did not scale back delivery times to retailers, Central would lower its prices to retailers, thereby implying financial harm to Boardwalk. Boardwalk's services did not change, and Central lowered its prices. Prior to the Kickoff Date, Boardwalk was on a path to become the dominant distributor of wine and spirits in Oklahoma.

### C.  The Competitive System's Dominant National Distributors.

17.   Southern Glazer's is the largest wine and spirits national distributor in the nation. It markets, promotes, merchandises and distributes over 5,000 brands. It sells in 44 states, the District of Columbia, and Canada. *Forbes* reports its 2019 revenues as $19 billion. The second largest National Distributor in the nation is Republic. It markets in 34 states directly or indirectly. *Forbes* reports its 2019 revenues as $7.4 billion, including, food, drink and tobacco. The success of both of these National Distributors is largely dependent on how many Brands they represent. Brands typically sell only to one National Distributor.

18.   On information and belief, as of January 1, 2016 and after, Southern Glazer's and Republic, each had many Brands under national exclusive dealing contracts or in relationships where there was little or no opportunity for a Brand to move its sales to a different National Distributor or local distributing company.

### D.  The Conspiracy and Its Offensive Actions to Combat Boardwalk and Seize (Restrain) the Market.

19.   One method for Central and Jarboe to expand their businesses and to protect their enterprise value was through alliances that each had and began to further develop prior to and after

6

2015 between Republic and Central, and Glazer's and later Southern Glazer's and Jarboe. For Central, this was shown by its close relation with Republic NRS, the Oklahoma non-resident seller for Republic. It shared warehouse space in Oklahoma City with Central, and shared employees, marketing and directors. In addition, the Naifeh Family Trust owned Republic NRS until 2004, when Republic acquired a 50% ownership.

20. Glazer's and later Southern Glazer's, at least after 2015, had a close relationship with Jarboe. In 2015, Jarboe began construction of a large new state of the art warehouse in Tulsa, Oklahoma. It is believed to have emulated a design similar to that used by Southern for a warehouse in San Antonio, Texas.

21. As these relationships continued to develop, activity to change the laws pertaining to consumable alcohol in Oklahoma became more pronounced after January 1, 2015. This may have arisen solely from the competitive pressure Boardwalk was exerting on Central and Jarboe, who in turn jointly sought to develop legislative relief. .

22. The process for change in the alcohol law ostensibly began in 2015 in the Oklahoma state legislature, and was led by Senator Clark Jolly ("Jolly"). He began to conduct meetings on revisions to the then existing provisions in Article 28 of the Oklahoma Constitution. It is believed that Jolly was at the time and thereafter closely aligned with the interests of Central and Jarboe, and acted for their benefit in the legislative process that led to 28A.

23. The close relation between Republic and Central and a motive for them in new legislation was exhibited in these legislative meetings, *e.g.*, Brad Naifeh was a member of the Naifeh family that owned Central and is believed to be a Trustee of the Naifeh Family Trust that owned Republic NRS. He was the primary spokesperson at least after January 1, 2015 for Central within Oklahoma until his death on July 29, 2018. He attended the legislative meetings. In the midst of one

7

of these meetings on May 27, 2015, Brad Naifeh stated he wanted Republic to be able to buy into Central, which at the time was prohibited by law. Such a buy in was a means for Central (and Jarboe) to realize actual dollars on their enterprise value, which at the time was declining because of Boardwalk, and to enhance their ability to compete against Boardwalk.

24. Boardwalk was conspicuously **not** invited to the legislative meetings on changes to Oklahoma's alcohol laws. This reflected that Central and Jarboe through their joint involvement in, and promotion of, the legislative effort had as an objective the elimination of Boardwalk as a competitor.

25. To further their joint objective in 2015, Jarboe and Central joined together and formed a lobbying and public relations entity referred to as The Institute for Responsible Alcohol Policy ("IRAP"). Its purpose was ostensibly to advocate for new alcohol laws in Oklahoma, but in reality it acted to disguise the activities of Jarboe and Central in aggressively pursuing new legislation to replace the existing alcohol distribution laws. IRAP had as its principal spokesperson, John Maisch, Esq. ("Maisch"), who previously worked for the Alcohol Beverage Laws Enforcement Commission (the "ABLE Commission"), and supported the Competitive System. These joint legislative and advocacy activities showed, and were a part of, a conspiracy among Central, Jarboe, and the Defendants (collectively, the "Conspirators") to eliminate Boardwalk as a competitor through a group boycott, to enhance enterprise value of Central and of Jarboe, and to dominate and control the distribution market for wine and spirits in Oklahoma (the "Conspiracy"), all of which constituted a restraint of trade to be facilitated by new legislation.

26. In 2015 and 2016, IRAP, and the Conspirators, through their owners, officers and agents, promoted the development and passage of an amendment to Article 28 of the Oklahoma

Constitution that became 28A, which by slight of hand, changed the Competitive System to the severe detriment of competition for the sale of wine and spirits at the distributor level in Oklahoma.

27. Jolly was the lead legislative proponent of this amendment. On belief he was allied with and directed by Central and Jarboe in the development of the legislative measure proposed to repeal the current Article 28 of the Oklahoma Constitution, and to replace it with a new Article 28A (herein referred to as "28A"). 28A represented a paradigm shift in Oklahoma alcohol policy and law. Its most public and almost solely discussed feature prior to its passage was to allow the sale of wine and strong beer in grocery stores and the sale of non-alcohol products in liquor stores subject to limitation (collectively, the "Expanded Provisions").

28. These Expanded Provisions in 28A may have been developed as a diversion from the seismic shift in the law governing the distribution of wine and spirits in Oklahoma that came to be embedded in 28A. The shift was virtually unknown, except to a select few, including the Conspirators and their legislative operatives. This shift was accomplished solely by changing a word "shall" in the existing law to "may" in 28A. Prior to passage of 28A this change was not discussed openly in the legislative halls or outside them. The change is believed to have been withheld and added at the last minute to the newly proposed legislation by Jolly and his colleague, Senator Stephanie Bice, who refused to disclose the complete contents of 28A, until the last minute, which was on the day when the final bill was rushed through committee. The Conspirators are believed to be the source of the change.

29. The exact change in language is best seen by comparing the old and new law. Prior to the enactment of 28A, Article 28, § 3 of the Oklahoma Constitution provided (emphasis added):

> Provided, that any manufacturer, or subsidiary of any manufacturer, who markets his or her product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker, brewer, or importer of alcoholic beverages, bottled or made in a foreign country, either within or without this state, **shall** be required to sell such brands or

> kinds of alcoholic beverages to every licensed wholesale distributor who desires to purchase the same, on the same price basis and without discrimination, and shall further be required to sell such beverages only to those distributors licensed as wholesale distributors.

This emphasized language required that Brands sell to all distributors at the same price, and insured competition between the Oklahoma distributors of wine and spirits. It was changed by language in 28A, which undercut competition by stating (emphasis added):

> A manufacturer, except a brewer, or subsidiary of any manufacturer, who markets his or her product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker or importer of alcoholic beverages, bottled or made in a foreign country, either within or without this state, **may** sell such brands or kinds of alcoholic beverages to any licensed wholesaler who desires to purchase the same. Provided, if a manufacturer, except a brewer, elects to sell its products to multiple wholesalers, such sales shall be made on the same price basis and without discrimination to each wholesaler;
> . . .

30.     In essence, the previous law as it applied to distribution of alcohol at the distributor level was monumentally changed by removing "shall" in the existing constitutional provision and replacing it with "may" in 28A, *i.e.*, the requirement for Brands to sell to **all** distributors at the same price in Oklahoma was changed to say they "may" sell to all distributors (at the same price), or, alternatively, sell only to one. No price qualification was attached to the selection of a single distributor.

31.     This alteration in the law allowed Brands represented by Republic and Southern Glazer's through their NRSs to sell or cause sales exclusively to a single distributor in the State of Oklahoma, *i.e.*, Republic-Central and Southern-Jarboe, respectively. This enhanced their national footprint and accomplished a primary aim of the Conspiracy to induce sales to a single distributor.

32.     This seismic shift was a first step in the legislation enabling a restraint of trade, *i.e.*, removing Boardwalk as a competitor through the alignment of Brands with either Republic-Central

or Southern-Jarboe, and controlling the wine and spirits product market in Oklahoma at the distributor or wholesale level by those entities.

33.  The next step for the Conspirators was a further provision in 28A contrived by them that allowed Republic and Southern Glazer's to purchase ownership up to 50% of a distributor in Oklahoma:

> C.  The holder of a license specified in subsection B of this section may enter into an agreement with a corporation, limited liability company or similar business entity that would otherwise be prohibited from obtaining a license in this state under this section, provided that the corporation, limited liability company or similar business entity:
> . . .
> . . .
> . . .
> 4.  Will not maintain more than a fifty percent (50%) equity interest in the license holder at any time.

Given this provision, on or before the Kickoff Date, Republic is believed to have acquired 49% of Central, and Southern Glazer's to have acquired 49% of Jarboe. The Conspiracy thus realized its further objective of freeing up enterprise value for both Central and Jarboe. The purchases on the Kickoff Date resulted in the combined entities of Republic-Central and Southern-Jarboe. This new provision in the law foretold the potential for a complete acquisition of the two distributors in the future.

34.  The Conspirators thus shaped 28A to accomplish their aims and they promoted its passage. On November 8, 2016, the proposed 28A was approved in a referendum election in Oklahoma. 28A became part of the Oklahoma Constitution upon certification on November 15, 2016 by the Oklahoma State Election Board. Section 2(A)(1) of 28A became effective as of the certification. However, the remaining provisions of 28A, including the changes to the distribution

of wine and spirits, and to the purchase of ownership in a distributor did not become effective until the Kickoff Date.

35. After the Kickoff Date, Hendershot and others spoke forcefully about the slight of hand and its anticompetitive aspects, including, among other things, (a) the threat of eliminating competition among distributors; (b) the reduction of services to retailers; and (c) price increases in wine and spirits. These threats and their partial realization led to a new law, Senate Bill 608, which was passed in the 2019 legislative session and signed by the Governor on May 13, 2019 ("608"). Through 608 its supporters sought to redress the competitive disruption at the distributor level caused by 28A. Prior to, and particularly after its passage, 608 was vigorously attacked by the Conspirators through their officers, managers, agents, and certain Brands believed to have been recruited by them. These efforts bore the Conspirators fruit as on January 22, 2020, through a lawsuit in which Southern-Jarboe and Republic-Central were parties, the new legislation was declared unconstitutional by a 5-4 vote of the Oklahoma Supreme Court.

36. The changes in the law wrought through 28A by the Conspiracy, the consequent disruption of the competitive marketplace that resulted in a restraint of trade causing higher prices for wine and spirits, and the group boycott of Boardwalk, are the focus of this Complaint. 28A altered the Competitive System in a manner that facilitated and led to a restraint of trade in the distributor marketplace for wine and spirits in Oklahoma, thereby injuring competition in violation of the Sherman Act, 15 U.S.C. § 1, as described hereafter. These circumstances also caused the demise of Boardwalk through a group boycott, *i.e.*, Boardwalk after October 1, 2018, was kicked off the competitive playing field as a distributor. Its declining sales after the Kickoff Date show this: in 2018, Boardwalk's average monthly sales for the first 9 months were $8,177,000.00, while in the last three months, which are the best for sales, the average monthly sales were $3,936,600.00 ; and

sales in 2017 were as shown above, $97.6 million, but for 2019, sales were $26.2 million, or a 73% decline.

### E.     The Crafting of the Group Boycott by the Conspirators.

37.     Leading up to 28A's implementation on the Kickoff Date, the Conspirators began to consolidate and obtain commitments from Brands to sell wine and spirits only to the entities planned meaningfully to exist after implementation of 28A on the Kickoff Date, *i.e.*, Republic-Central, and Southern-Jarboe. (Some small boutique distributors did survive or arose.)

38.     This effort included obtaining a "letter of designation" whereby a Brand had to designate the entity it would sell to after implementation of 28A. In this effort the Conspirators expressly, or implicitly, discouraged the opportunity offered to the Brands under 28A to sell to **all** distributors. The top 100 Brands after the Kickoff Date, took the option which reflected their commitment to sell only to Republic-Central or to Southern-Jarboe. This is shown by purchase order fulfillment of the Brands, who only took orders from their chosen distributor.

39.     Boardwalk, as the third largest statewide distributor of wine and spirits in Oklahoma, likewise prior to the Kickoff Date sought to recruit Brands to sell to it. Boardwalk, however, had **no** success whatsoever in entering into an arrangement for sales to it by **any** of the top 100 Brands of wine and spirits sold in Oklahoma. These Brands committed either to Southern-Jarboe or Republic-Central.

40.     The Conspirators knew, and intended, that the relationships and interactions of Republic, Southern Glazer's and the Conspirators with the Brands of wine and spirits selling into Oklahoma would naturally result in a restraint of trade in the market for wine and spirits at the distributor level, *i.e.*, a group boycott that eliminated Boardwalk as a viable competitor, and that

enabled the Conspirators imposition of higher prices for wine and spirits and their reduced services for retailers.

41. The alignment of Brands with either Republic-Central or Southern Jarboe occurred at least in part through the leverage derived from the National Distributors, *i.e.*, Republic and Southern Glazer's. This leverage arose and existed from the large national presence and marketing power that Republic and Southern Glazer's have over the Brands. To exert this leverage to secure Brands for Oklahoma sales, Jarboe, Jarboe NRS, Central, and Republic NRS could promise, extend an opportunity, or imply to a Brand, the opportunity to sell in another state besides Oklahoma, where Southern Glazer's, or Republic, respectively, had a presence, and the Brand at that time did not have one. Alternatively, the aforesaid Oklahoma actors could rely on Souther Glazer's or Republic to act for them. Later, after the Kickoff Date, the Defendant Conspirators inherited or had this ability. Leverage also arose because, if the Brand did not sell in Oklahoma to Republic-Central or Southern-Jarboe, the Brand knew it was exposed to its sales to or through that National Distributor (*i.e.*, Republic, Southern Glazer's, or their agents) in other states being cut back or eliminated.

42. By aligning solely with Republic-Central or Southern-Jarboe, a Brand was not acting in its best economic interest, and no efficiency creating activity occurred in the distributor market. Sales by each Brand to all distributors in Oklahoma would have enhanced the prospects of greater sales within Oklahoma simply by the amplification of sales and service efforts of additional distributors. In addition, a sale to all distributors in Oklahoma allowed a Brand to take advantage of the unique character and efficiencies of each distributor, *e.g.*, Boardwalk excelled in service to retailers, while Central and Jarboe were maintaining large inventories.

43. The exclusive commitment by a Brand to Republic-Central or to Southern-Jarboe was also not in the Brands' economic interest as it limited sales by the Brands because of higher prices

directly, or indirectly, through bottle handling charges or increased fees, all of which Republic-Central and Southern-Jarboe could and did effect in parallel with the other. These increases were enabled because of the individual monopolies on given Brands held by Republic-Central and Southern-Jarboe. Each of them also reduced services to retailers further cutting Brand sales. These actions further restrained trade in the distributor's sales market.

44.    In promoting 28A, the Conspirators contended that the sale to one, as opposed to all, distributors enabled better quality control. This argument is belied by the fact that no quality protection issues were strongly voiced in the nearly sixty years between the elimination of prohibition in Oklahoma and the passage of 28A. Moreover, no significant concrete actions to protect quality control since the passage of 28A are known to have been implemented. Finally, the Competitive System allowed quality control as shown in the following paragraph.

45.    A leading proponent of 28A, Maisch (referred to earlier in ¶ 26), wrote in The Oklahoma Bar Journal edition of April, 2010, an article in praise of the competitiveness engendered by the Competitive System. This despite his promoting 28A and claiming quality control issues. In a contradiction, Maisch's article stated:

> The three-tier system allows a state to track every single liter of alcoholic beverage from the moment it is brought into the state until the time it is sold by licensed restaurant, bar or liquor store.
>
> Monitoring the flow of alcoholic beverages is important for several reasons. By accounting for the product at every level, Oklahoma reduces the likelihood that adulterated or contaminated alcoholic beverages will enter the marketplace. Effective monitoring also reduces the likelihood that those alcoholic beverages end up in the hands of minors or intoxicated persons.

In other words, quality control existed before 28A.

46.    Further, in promoting and later defending 28A, the Brands, and the Conspirators used the catch phrase "forced sale" to refer to the sale to all distributors as was required prior to 28A.