IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  BRYAN HENDERSHOT, an individual  f/d/b/a<br>BOARDWALK DISTRIBUTION COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>1.  SOUTHERN GLAZER'S WINE AND SPIRITS<br>OF OKLAHOMA, LLLP d/b/a JARBOE SALES<br>COMPANY;<br>2.  CENTRAL LIQUOR COMPANY, L.P.<br>d/b/a RNDC OKLAHOMA;<br>3.  BEST BRANDS OF DELAWARE, L.L.C.<br>d/b/a REPUBLIC NATIONAL DISTRIBUTING<br>COMPANY;   and<br>4.  BRIAN LIDJI, an individual d/b/a<br>SOUTHERN GLAZER'S WINE & SPIRITS<br>OF OKLAHOMA,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 20-CV-652 CVE CDL<br><br>Jury Trial Demanded<br>No Prior Cases |

## AMENDED COMPLAINT

Plaintiff, Bryan Hendershot ("Hendershot"), for his claim for relief against the Defendants,

alleges and states:

## I.    THE PARTIES, THEIR BACKGROUNDS, AND ASSOCIATED ENTITIES.

1.    Plaintiff, Hendershot, is a resident of Tulsa, Oklahoma.  He formerly owned and

operated Boardwalk Distribution Company ("Boardwalk"), a sole proprietorship in Tulsa that was

a distributor of wine, spirits and beer to retailers in Oklahoma.  After  the passage of an amendment

to the Oklahoma Constitution referred to herein as "28A," that authorized brands of spirits and wine

to sell only to one distributor and its full implementation as of October 1, 2018 (the "Kickoff Date"),

the Defendants, two of whom were direct horizontal competitors of Boardwalk, conspired and

created a restraint of trade, a group boycott of Boardwalk, in violation of Section 1 of the Sherman

Anti Trust Act, and either Southern-Jarboe or Republic-Central monopolized one, or the other, or both of the wine and spirits product markets in Oklahoma, or separately with their respective NRS, conspired and attempted to monopolize one, or the other, or both of the product markets for wine and spirits in the state of Oklahoma in violation of Section 2 of the Sherman Anti Trust Act.  These efforts caused Hendershot to suffer a loss of at least $22 million.  Given this loss, Hendershot sold the assets of Boardwalk in mid-2020, but remained obligated on Boardwalk's debt, and retained his claims herein.  Eventually, Boardwalk ceased to function.

2.      As of January 1, 2014, two dominant distributors of wine and spirits in sales and enterprise value existed in Oklahoma.  They were Central Liquor Company LP ("Central") based in Oklahoma City, and Jarboe Sales Company ("Jarboe") based in Tulsa. Jarboe's and Central's corporate evolution and associations prior to 28A, and after, involved the Defendants, all of whom are Conspirators in bringing about the group boycott, and other anticompetitive actions and effects described herein.

3.      Defendant, Southern Glazer's Wine & Spirits of Oklahoma, LLLP d/b/a Jarboe Sales Company ("Southern-Jarboe"), is an Oklahoma limited liability limited partnership resulting from Southern Glazer's Wines & Spirits, Inc.'s purchase of what is believed to be a 49% interest in Jarboe that was formalized on the Kickoff Date - a purchase authorized by 28A.  Prior to that date, Jarboe, as a distributor of wine and spirits in Oklahoma, played a central role as further alleged herein in the passage of 28A, and afterwards was active in promoting and securing brands of wine and spirits to sell only to Southern-Jarboe in Oklahoma after the Kickoff Date.  Through its charter and wine and spirits sales in Oklahoma, Southern-Jarboe has contacts in Oklahoma, and specifically in the Northern Judicial District of Oklahoma that warrant the exercise by this Court of jurisdiction over it.

4.      The purchase of an interest in Jarboe on the Kickoff Date had its origins with Southern Wine & Spirits of America ("Southern").  It was a national alcohol distributing entity (a "National Distributor") up to 2016.  In that year, Southern merged with Glazer's Wine and Spirits ("Glazer's"), another National Distributor of alcohol, and the two became Southern Glazer's Wine and Spirits, Inc. ("Southern Glazer's").  Southern Glazer's after the Kickoff Date was a source of brands of wine and spirits to sell only to Southern-Jarboe after the Kickoff Date.

5.      Central on the Kickoff Date became Defendant, Central Liquor Company L.P. d/b/a RNDC Oklahoma ("Republic-Central"), an Oklahoma limited partnership entity.  It resulted from Republic National Distributing Company LLC's purchase of a 49% interest in Central on the Kickoff Date - another purchase authorized by 28A.  Prior to that date, Central played a primary role in the passage of 28A, and afterwards was active in promoting and securing brands of wine and spirits to sell only to Republic-Central in Oklahoma after the Kickoff Date.  Through its partnership charter and sales in Oklahoma, Republic-Central has substantial jurisdictional contacts in the Northern Judicial District of Oklahoma that enable this Court to exert jurisdiction over it.

6.      The purchaser of an interest in Central, Republic National Distributing Company, LLC ("Republic"), is a National Distributor that after the Kickoff Date was a source of brands of wine and spirits to sell only to Republic-Central.

7.      The National Distributors, as well as brands of wine and spirits, prior to and after the Kickoff Date, were required by law in Oklahoma to have Oklahoma resident agents, referred to as a non-resident seller (hereafter, "NRS"), that were required to secure a license in Oklahoma and then to serve as pass through entities for sales of wine and spirits into Oklahoma.  The specific NRS Defendants are identified below.

8.      Brian Lidji d/b/a Southern Glazer's Wine & Spirits of Oklahoma ("Southern NRS"), was the non-resident seller to Jarboe prior to the Kickoff Date, and after it to Southern-Jarboe.  On information and belief, he, directly or indirectly, played a role in the passage of 28A, and afterward was active in promoting and securing brands prior to and after the Kickoff Date to sell wine and spirits only to Southern-Jarboe in Oklahoma.  Through his licensing and sales activity in Oklahoma, he has  jurisdictional contacts in the Northern Judicial District of Oklahoma that enable this Court to exert jurisdiction over him.

9.      Best Brands of Delaware, LLC, d/b/a Republic National Distributing Company ("Republic NRS") was and is the non-resident seller in Oklahoma to Central and then to Republic-Central after the Kickoff Date.  Republic NRS is 50% owned by the Naifeh Family Trust of Oklahoma City, and 50% owned by Republic.  It was active in securing the passage of 28A, and afterward in promoting and securing brands of wine and spirits to sell only to Republic-Central in Oklahoma after the Kickoff Date.  Through its licensing in Oklahoma, sales of wine and spirits in Oklahoma and other business contacts, it has substantial jurisdictional contacts in the Northern Judicial District of Oklahoma that enable this Court to exert jurisdiction over it.

## II.      JURISDICTION AND VENUE.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 26.

## III.      BACKGROUND PRIOR TO THE PASSAGE OF 28A.

### A.      The competitive system in Oklahoma for distribution of alcohol.

11.      A three-tier system for distribution of alcohol arose by legislation in Oklahoma after the repeal of Prohibition in 1959.  This and the business activities related thereto are hereafter referred

to as the "Competitive System." The Competitive System existed in Oklahoma until the Kickoff Date.

12.     28A displaced the Competitive System. The three tiers of the wine and spirits markets under the Competitive System were (1) the brand or manufacturer, *e.g.*, distiller, winemaker etc., (a "Brand"), (2) distributor or wholesaler, and (3) retailer, *e.g.*, liquor stores. This structure was maintained by law that required distributors to be sole proprietors and residents of Oklahoma. This prohibited any out of state ownership of a distributor. A basic legal tenant of the Competitive System was that Brands had to sell their wine and spirits to **all** the distributors in Oklahoma at the same price, thereby insuring competition among the distributors in their sales to retailers, and their sales in turn to consumers. The distributors acted as wholesalers, and sold wine and spirits to retailers. Only retailers could sell to consumers.

**B.     Boardwalk's competition with Central and Jarboe under the Competitive System and its impact on them.**

13.     Until the Kickoff Date, Oklahoma law required that Brands sell to every distributor in the state at the same price. This allowed entrance to the Oklahoma market place for competitive distributors, but the size of Central and Jarboe made a successful new entry by a multi-brand distributor very difficult. Central and Jarboe had sufficient size and relationships to access all Brands, warehouse them, and have a fleet of trucks to distribute them. This prevented any major competitive challenge to either of them until Boardwalk emerged.

14.     In 2014, Boardwalk began to rise as a substantial competitor of Central and Jarboe. This occurred largely though Boardwalk's increased services to its customers, *i.e.*, liquor stores, including deliveries everyday to any retailer in the state, through its own fleet of trucks, and a

willingness to receive orders late in the day.  These services exceeded those offered by Central and Jarboe.

15.     Boardwalk's competitiveness was shown in its annual realized and increasing sales revenues:

| | |
|---|---|
| 2014 | $22.5 million |
| 2015 | $36.6 million |
| 2016 | $67.4 million |
| 2017 | $97.6 million |

16.     A large portion of Boardwalk's sales were reflected in declining sales trends of its two major horizontal competitors:   Central and Jarboe.   The increasingly tough competition from Boardwalk eroded the enterprise value of each of Central and of Jarboe, and threatened more erosion in the future to the extent that it threatened the market dominance of Central and Jarboe.   Brad Naifeh, an owner of Central, acknowledged this when at lunch with Hendershot he handed Hendershot a note that said, if Boardwalk did not scale back delivery times to retailers, Central would lower its prices to retailers, thereby implying financial harm to Boardwalk.  Boardwalk's services did not change, and Central lowered its prices.  Prior to the Kickoff Date, Boardwalk was on a path to become the dominant distributor of wine and spirits in Oklahoma.

C.     **The Competitive System's dominant National Distributors.**

17.     Southern Glazer's is the largest wine and spirits National Distributor in the nation. It markets, promotes, merchandises and distributes over 5,000 brands.  It sells in 44 states, the District of Columbia, and Canada.  *Forbes* reports its 2019 revenues as $19 billion.  The second largest National Distributor in the nation is Republic.  It markets in 34 states directly or indirectly. *Forbes* reports its 2019 revenues as $7.4 billion, including, food, drink and tobacco.  The success of

both of these National Distributors is largely dependent on how many Brands they represent. Brands typically sell only to one National Distributor.

18.     On information and belief, as of January 1, 2016 and after, Southern Glazer's and Republic, each had many Brands under national exclusive dealing contracts or in relationships where there was little or no opportunity for a Brand to move its sales to a different National Distributor or local distributing company, except in states like Oklahoma where until 28A sales to all distributors were required.

**D.     The joint legislative initiative resulting in 28A.**

19.     One method for Central and Jarboe to expand their businesses and to protect their enterprise value was through alliances that each had and began to further develop prior to and after 2015 between Republic and Central, and Glazer's, then later Southern Glazer's, and Jarboe. For Central, this was shown by its close relation with Republic NRS, the Oklahoma non-resident seller for Republic. It shared warehouse space in Oklahoma City with Central, and shared employees, marketing and directors. In addition, the Naifeh Family Trust owned Republic NRS until 2004, when Republic acquired a 50% ownership.

20.     Glazer's, and later Southern Glazer's, had a close relationship with Jarboe. In 2015, Jarboe began construction of a large new state of the art warehouse in Tulsa, Oklahoma. It is believed to have emulated a design similar to that used by Southern for a warehouse in San Antonio, Texas.

21.     As these relationships continued to develop, after January 1, 2015, activity to change the laws pertaining to consumable alcohol in Oklahoma became more pronounced. This may have arisen solely from the competitive pressure Boardwalk was exerting on Central and Jarboe, as they jointly sought to develop legislative relief.

22.     The process for change in the alcohol law ostensibly began in 2015 in the Oklahoma state legislature, and was led by Senator Clark Jolly ("Jolly").  He began to conduct meetings on revisions to the then existing provisions in Article 28 of the Oklahoma Constitution.  It is believed that Jolly was at the time and thereafter closely aligned with the interests of Central and Jarboe, and acted for their benefit in the legislative process that led to 28A.

23.     The close relation between Republic and Central and a motive for them in new legislation was exhibited in these legislative meetings, *e.g.*, Brad Naifeh was a member of the Naifeh family that owned Central and is believed to be a Trustee of the Naifeh Family Trust that owned Republic NRS. He was the primary spokesperson at least after January 1, 2015 for Central within Oklahoma until his death on July 29, 2018. He attended the legislative meetings.  In the midst of one of these meetings on May 27, 2015, Brad Naifeh stated he wanted Republic to be able to buy into Central, which at the time was prohibited by law.  Such a buy in was a means for Central (and Jarboe) to realize actual dollars on its enterprise value, which at the time was declining because of Boardwalk, and to enhance its ability to compete against Boardwalk.

24.     Boardwalk was conspicuously **not** invited to the legislative meetings on changes to Oklahoma's alcohol laws.  This reflected that Central and Jarboe through their joint involvement in, and promotion of, the legislative effort had as an objective the elimination of Boardwalk as a competitor.

25.     To further their joint objective in 2015, Jarboe and Central joined together and formed a lobbying and public relations entity referred to as The Institute for Responsible Alcohol Policy ("IRAP").  Its purpose was ostensibly to advocate for new alcohol laws in Oklahoma, but in reality it acted to disguise the activities of Jarboe and Central in aggressively pursuing new legislation to replace the existing alcohol distribution laws.  IRAP had as its principal spokesperson, John Maisch,

Esq. ("Maisch"), who previously worked for the Alcohol Beverage Laws Enforcement Commission of Oklahoma (the "ABLE Commission"), and supported the Competitive System. These joint legislative and advocacy activities by Central, Jarboe, and their NRSs were aimed at a favorable change in Oklahoma's alcohol laws for them.

26.     These joint efforts resulted in the development and passage of an amendment to Article 28 of the Oklahoma Constitution that became 28A, which, among other things, by slight of hand, changed the Competitive System in a manner described hereafter.

27.     Jolly was the lead legislative proponent of this amendment. On belief he was allied with and directed by Central and Jarboe in the development of the legislative measure proposed to repeal the current Article 28 of the Oklahoma Constitution, and to replace it with a new Article 28A (herein referred to as "28A"). 28A represented a paradigm shift in Oklahoma alcohol policy and law. Its most public and almost solely discussed feature prior to its passage was to allow the sale of wine and strong beer in grocery stores and the sale of non-alcohol products in liquor stores subject to limitation (collectively, the "Expanded Provisions").

28.     These Expanded Provisions in 28A may have been developed as a diversion from the seismic shift in the law governing the distribution of wine and spirits in Oklahoma that came to be embedded in 28A. This shift was virtually unknown, except to a select few believed to include Central, Jarboe their NRSs, and their legislative operatives. The shift was accomplished solely by changing a word "shall" in the existing law to "may" in 28A. Prior to passage of 28A this change was not discussed openly in the legislative halls or outside them. The change is believed to have been withheld and added at the last minute to the newly proposed legislation by Jolly and his colleague, Senator Stephanie Bice, who refused to disclose the complete contents of 28A, including the "slight of hand," until the last minute, which was on the day when the final bill was rushed through

committee.  Central, Jarboe, and their respective NRSs are believed to be the source of this change in the law.

29.    The exact change in language is best seen by comparing the old and new law.  Prior to the enactment of 28A, Article 28, § 3 of the Oklahoma Constitution provided (emphasis added):

> Provided, that any manufacturer, or subsidiary of any manufacturer, who markets his or her product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker, brewer, or importer of alcoholic beverages, bottled or made in a foreign country, either within or without this state, **shall** be required to sell such brands or kinds of alcoholic beverages to every licensed wholesale distributor who desires to purchase the same, on the same price basis and without discrimination, and shall further be required to sell such beverages only to those distributors licensed as wholesale distributors.

This emphasized language required that Brands sell to all distributors at the same price, and insured competition between the Oklahoma distributors of wine and spirits.  It was changed by language in 28A, which changed the competitive landscape by stating (emphasis added):

> A manufacturer, except a brewer, or subsidiary of any manufacturer, who markets his or her product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker or importer of alcoholic beverages, bottled or made in a foreign country, either within or without this state, **may** sell such brands or kinds of alcoholic beverages to any licensed wholesaler who desires to purchase the same.  Provided, if a manufacturer, except a brewer, elects to sell its products to multiple wholesalers, such sales shall be made on the same price basis and without discrimination to each wholesaler;
> . . .

30.    In essence, the previous law as it applied to distribution of alcohol at the distributor level was changed by removing "shall" in the existing constitutional provision and replacing it with "may" in 28A, *i.e.*, the requirement for Brands to sell to **all** distributors at the same price in Oklahoma was changed to say they "may" sell to distributors (at the same price), or, alternatively, sell only to one.  No price qualification was attached to the selection of a single distributor.

31.     This alteration in the law allowed Brands represented by Republic and Southern Glazer's through their NRSs to sell or cause sales exclusively to a single distributor in the State of Oklahoma, *e.g.*, Republic-Central and Southern-Jarboe, respectively.

32.     The new legislation had another component believed to be contrived by Central and Jarboe that allowed a purchase of ownership up to 50% of a distributor in Oklahoma.  28A provided:

> C.      The holder of a license specified in subsection B of this section may enter into an agreement with a corporation, limited liability company or similar business entity that would otherwise be prohibited from obtaining a license in this state under this section, provided that the corporation, limited liability company or similar business entity:
> . . .
> . . .
> . . .
> > 4.   Will not maintain more than a fifty percent (50%) equity interest in the license holder at any time.

Given this provision, on or before the Kickoff Date, Republic is believed to have acquired 49% of Central, and Southern Glazer's to have acquired 49% of Jarboe.  Central and Jarboe thus realized a further objective of freeing up enterprise value for themselves.  The purchases believed to be effected on or before the Kickoff Date resulted in the combined entities of Republic-Central and Southern-Jarboe.  This new provision in the law foretold the potential for a complete acquisition of Central and Jarboe in the future, which would unlock their entire enterprise value.

33.     28A was thus shaped to accomplish the aims of Central and Jarboe.  On November 8, 2016, the proposed 28A was approved in a referendum election in Oklahoma.  28A became part of the Oklahoma Constitution upon certification on November 15, 2016 by the Oklahoma State Election Board.  Section 2(A)(1) of 28A became effective as of the certification.  However, the remaining provisions of 28A, including the changes to the distribution of wine and spirits, and to the purchase of ownership in a distributor, did not become effective until the Kickoff Date.

34.     Hendershot is not making a claim on these legislative efforts as set forth above, or on any lawsuits deriving therefrom or related to Senate Bill 608 in Oklahoma.

## IV.   THE CRAFTING OF THE GROUP BOYCOTT BY THE CONSPIRATORS AFTER PASSAGE OF 28A.

35.     The focus of this Amended Complaint is the Conspiracy formed after the passage of 28A among the Defendants, and their predecessors, *i.e.*, Jarboe and Central (the "Conspirators"), that arose from a shared aim among the owners and officers of the Conspirators, including without limitation, Brad Naifeh, President of Central, David Ziegler, President of Republic National Distributing Co. and later RNDC of Oklahoma, John Jarboe, and John Jarboe, II, owners of Jarboe, to maintain and to secure Brands for their companies to sell to the exclusion of Boardwalk and to thereby force Boardwalk from competition with them through a group boycott in the distributor markets for wine and spirits in Oklahoma in violation of the Sherman Act, 15 U.S.C. § 1, and to attempt to monopolize, and to monopolize the markets for wine and spirits in Oklahoma in violation of the Sherman Act, 15 U.S.C. § 2.  These efforts caused the demise of Boardwalk, which after the Kickoff Date was over time kicked off the competitive playing field as a distributor.  Boardwalk's declining sales after the Kickoff Date show this.  In 2018, Boardwalk's average monthly sales for the first 9 months (before the Kickoff Date) were $8,177,000.00, while in the last three months, which are typically the best months for sales, the average monthly sales were $3,936,600.00; and total sales in 2017 were $97.6 million, but for 2019, sales were $26.2 million, or a 73% decline.

36.     Leading up to 28A's implementation on the Kickoff Date, each of Central and Jarboe and their respective NRSs solicited as necessary, and obtained commitments from Brands to sell wine and spirits only to Republic-Central, or to Southern-Jarboe, respectively after the Kickoff Date (the "Preparations for the Kickoff").  In this effort, on belief, the Conspirators agreed to and did, expressly

or implicitly, discourage the opportunity available to the Brands under 28A to sell to Boardwalk.  In a substantial number of cases the Conspirators knew that a commitment from a Brand to Central or Jarboe, or to their successor entities, was a foregone conclusion, because of pre-existing sales relations.  In furtherance of the Conspiracy and to effect division of the Oklahoma markets for wine and spirits, the Conspirators met together after passage of 28A, and on belief discussed their efforts and sought to achieve an acceptable balance between them on wine and spirits to be represented by each.  On belief, these meetings also included assessments of Boardwalk's status with any Brands representation.

37.     The Preparations for the Kickoff also included obtaining a "letter of designation" whereby a Brand had to designate the entity it would sell to after the Kickoff Date.  Securing this letter was a key step in the implementation of the group boycott of Boardwalk.  As a part of the Conspiracy, the Conspirators worked together in the development of this letter to avoid conflict among them over the nature of the Brand commitment, and to assist in the commitment.

38.     Prior to the Kickoff Date, Boardwalk, as the third largest statewide distributor of wine and spirits in Oklahoma, likewise sought to recruit Brands to sell to it.  Boardwalk had **no** success in entering into an arrangement for sales to it by **any** of the top 100 Brands of wine and spirits sold in Oklahoma.  These Brands committed to sell only to Southern-Jarboe or to Republic-Central.

39.     The alignment of Brands with either Republic-Central or Southern-Jarboe occurred not through competition, but from pre-existing relationships, and from leverage, or tacit leverage, derived from the National Distributors, *i.e.*, Republic and Southern Glazer's. This leverage arose  and existed because of the marketing power that Republic and Southern Glazer's had over the Brands. Prior to the Kickoff Date to exert this leverage to secure Brands for Oklahoma sales, Jarboe, Jarboe NRS, Central, and Republic NRS could promise, extend an opportunity, or imply to a Brand, the

13

opportunity to sell in another state besides Oklahoma, where Southern Glazer's, or Republic, respectively, had a presence, and the Brand at that time did not have one. Later, after the Kickoff Date, the Conspirators had this ability. Leverage also arose because, if the Brand did not sell in Oklahoma to Republic-Central or Southern-Jarboe, the Brand knew it was exposed to its sales to or through that National Distributor (*i.e.,* Republic, Southern Glazer's, or their agents) in other states being cut back or eliminated. This leverage power existed after passage of 28A, was known by the Conspirators to exist, and assured the development of the group boycott.

40.     After the passage of 28A, the Conspirators knew, and intended, that the pre-existing relationships and leverage with the Brands of wine and spirits selling into Oklahoma would result in the boycott of Boardwalk in the markets for wine and spirits at the distributor level that would eliminate Boardwalk as a viable competitor, and assist in their efforts described hereafter to attempt to monopolize, or to monopolize the markets for wine and spirits in Oklahoma.

41.     Because of the pre-existing sales relationships, the tacit leverage that existed and the balancing undertaken by the Conspirators, there was no material competition for Brands among the Conspirators, or between them and Boardwalk.

42.     By aligning solely with Republic-Central or Southern-Jarboe, a Brand was not acting in its best economic interest, and no material efficiency creating activity occurred in the distributor markets. Sales by each Brand to Boardwalk or to additional distributors in Oklahoma would have enhanced the prospects of greater sales within Oklahoma simply by the amplification of sales and service efforts of additional distributors. In addition, a sale to Boardwalk or to additional distributors in Oklahoma allowed a Brand to take advantage of the unique character and efficiencies of each distributor, *e.g.*, Boardwalk excelled in service to retailers, while Central and Jarboe were maintaining large inventories.

43.     The exclusive commitment by a Brand to Republic-Central or to Southern-Jarboe was also not in the Brands' economic interest as it limited sales by the Brands, because of anti-competitive higher prices implemented directly on Brands, or indirectly, through increased bottle handling charges or increased fees, all of which Republic-Central and Southern-Jarboe after 28A could and did effect in parallel with the other further showing the Conspiracy.  These increases were enabled because of the individual monopolies on given Brands held by Republic-Central and Southern-Jarboe.  Each of them also made anticompetitive reductions in services to retailers further cutting Brand sales.  These actions also restrained trade in the Oklahoma distributor markets, and in interstate commerce.

44.     The Brands and Conspirators have argued after 28A that the sale to one distributor, as opposed to a distributor or distributors and Boardwalk, enabled better quality control.  This argument is belied by the fact that no quality protection issues were strongly voiced in the nearly sixty years between the elimination of prohibition in Oklahoma and the passage of 28A.  Moreover, no significant concrete actions to protect quality control since  the passage of 28A are known to have been implemented.

45.     A further joint and anti-competitive action by the Conspirators prior to the Kickoff Date, aimed at weakening Boardwalk, was exemplified by Republic NRS altering credit terms to Boardwalk as shown on Exhibit 1 attached hereto, while not enforcing such terms on Central or Jarboe.  In response Boardwalk had to secure a letter of credit from its bank.  These terms were known by Central and Jarboe, but neither acted on them.

## V.     THE GROUP BOYCOTT ACHIEVED.

46.     On the Kickoff Date, or shortly thereafter, the Conspirators achieved a perfect alignment of Brands which would sell only to Republic-Central or to Southern-Jarboe.  This effected

the group boycott of Boardwalk.  This outcome after 28A's passage was a result of the Conspirators acting as described above.

47.     The group boycott proved to be a substantial economic benefit to Republic-Central and Southern-Jarboe, and their co-Conspirators.  It enhanced enterprise values, destroyed Boardwalk as a competitor, and allowed actual complete control of the markets for wine and spirits in Oklahoma at the distributor level.  Brad Naifeh, the head of Central at the time, conceded this intention when at lunch in Oklahoma City in 2015 he told Hendershot that Boardwalk, after changes in the law, would be reduced to selling beer in Northeast Oklahoma.

48.     To enforce the group boycott, Southern-Jarboe, and on belief, Republic-Central, committed other anticompetitive actions, *e.g.*, a retailer was told that, if he bought from Boardwalk, his delivery days by Southern-Jarboe would be cut back.  Further, the Conspirators conspired and offered special deals and concessions to grocers to prelude Boardwalk from securing shelf space in their grocery stores.

49.     The group boycott was an illegal restraint of trade and enabled Republic-Central and Southern-Jarboe to control the distribution markets in Oklahoma for wine and for spirits (liquor), or at least 90 percent, or more, of them.  As of the time when statistics were last available, Southern-Jarboe and Republic-Central achieved and had a monopoly over distribution of all the top 100 Brands by volume sold in Oklahoma.  More specifically, Southern-Jarboe is believed to have a monopoly over 14 of the top 25 Brands of wine and spirits, and Republic-Central is believed to have a monopoly over the other 11 of the top 25 Brands.  The Conspirators have conspired since the passage of 28A to attempt to monopolize the product markets in Oklahoma, and each pair, *i.e.*, distributor plus its NRS, has the power to do so, and is dangerously close to achieving a monopoly as shown in this paragraph and in the anticompetitive conduct that destroyed Boardwalk.

50.    Through the group boycott, Boardwalk was eliminated as a competitor of Republic-Central and Southern-Jarboe in that each had Brands committed to sell only to them and each had leverage to back it up.  This effected an unreasonable restraint of trade in Oklahoma that reduced sales of the Brands from higher prices and from reduced service, all as set forth in ¶ 43, above, and confirmed below in ¶51.  The group boycott impaired the viability or eliminated smaller Brands, because Southern-Jarboe and Republic-Central promoted their larger Brands, and Boardwalk was not available to lend support to smaller Brands, which it had done.  This restraint of trade caused by the Conspiracy had substantial effects on interstate commerce.

## VI.    NEGATIVE IMPACTS OF 28A AND THE GROUP BOYCOTT ON RETAILERS AND COMPETITION.

51.    The implementation of 28A and the resulting group boycott "hamstrung" retail liquor stores across the state by severely limiting their options of what, from whom, and on what terms they could buy.  Many of these small businesses have seen their service quality and product supply decrease.  The two dominant wholesalers increased prices outright, increased bottle handling charges for purchases of less than a case, and implemented additional fees on purchases.  Anecdotal stories showing anti-competitive acts by the Conspirators in the product markets are evidenced by the following, and are believed to be replicated elsewhere in the state:

A.  One high-volume liquor store owner in south Oklahoma City swore under oath that "the two largest wholesalers significantly increased wholesale [prices] for wine and spirits – up by around 18% from before the new law was implemented, according to our numbers."  This owner further swore under oath that his deliveries dropped from five days a week to two.

B:  After implementation of 28A an Edmond retailer swore under oath that Central failed to supply two of his best-selling items – McCormick Vodka 80-Proof and Jim Beam – for a period of two weeks.  Southern-Jarboe he further swore increased his minimum order charge from $10 dollars for an order under $100 to $30 dollars for an order under $200, for no apparent reason.

C.  An El Reno retailer swore that, because of the monopolistic situation, [Republic-Central and Southern-Jarboe] controlled Route 66 Liquors' livelihood and "could easily put [it] out of business if they so desired."

D.  The situation post 28A's implementation was especially dire for rural retailers, who need consistent and frequent shipments to stay competitive.  Shangri-La and Beverage Service operates a resort on Monkey Island near Afton, Oklahoma.  It experienced fewer deliveries and lower product availability since 28A was implemented.  Southern-Jarboe and Republic-Central are metropolitan-focused and only deliver to Shangri-La once a week, whereas prior to implementation of 28A, Boardwalk was willing to deliver multiple times a week.

E.  In the opposite corner of the state, an Altus liquor store owner swore by affidavit that his customers suffered because of "infrequent deliveries and poor customer service" from the two dominant wholesalers.  For top brands, however, neither he nor Shangri-La have a choice.

52.     The commitment arrangements of the Conspirators with the Brands have decreased the access that many consumers have to certain Brands of wine and spirits, some of which  were widely available and have since become scarce.

53.     The group boycott was at the expense of lively competition among distributors, and exacerbated the existing barrier to any new entrant as a multi Brand distributor.  The boycott arose after 28A's passage and continued until Boardwalk ceased doing business as a result of the acts and circumstances set forth in ¶¶ 36-45 and ¶ 48.  It shows the ability of the Conspiracy to control and exert unchallenged domination by Republic-Central and Southern-Jarboe of the wine and spirits markets in Oklahoma through the elimination of the competition.  No express written agreement for this Conspiracy is known at present, however, as set forth above, there is substantial evidence to infer a Conspiracy beyond parallel conduct.

## COUNT 1
## *PER SE* VIOLATION OF SECTION 1 OF THE SHERMAN ACT.

54.     In this Count 1, Plaintiff incorporates by reference, the allegations contained in paragraphs 1 through 53 above, as if fully set forth herein.

55.     The scope and purpose of the Sherman Act was succinctly stated by the United States

Supreme Court in *Northern Pac. Ry. v. United States*, 356 U.S. 1, 4-5 (1958):

> The Sherman Act was designed to be a comprehensive charter of economic liberty
> aimed at preserving free and unfettered competition as the rule of trade.  It rests on
> the premise that the unrestrained interaction of competitive forces will yield the best
> allocation of our economic resources, the lowest prices, the highest quality and the
> greatest material progress, while at the same time providing an environment
> conducive to the preservation of our democratic political and social institutions.

> Section 1 of the Sherman Act provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in
> restraint of trade or commerce among the several States, or with foreign nations, is
> hereby declared to be illegal.

15 U.S.C. § 1.

56.     28A put in place a structure that allowed exploitation of the wholesale markets for

wine and spirits in Oklahoma.  With its passage, the Brands of wine and spirits were expected and

did align themselves with the Conspirators that resulted in a restraint of trade through a group

boycott that constituted a violation of the Sherman Act, 15 U.S.C. § 1, and the Oklahoma Antitrust

Reform Act 79 O.S. § 201 *et seq*.  The acts of the Conspirators after passage of 28A led after the

Kickoff Date to an anti-competitive denial of access by Boardwalk in Oklahoma to any of the top one

hundred Brands of wine and spirits that were controlled by Republic-Central and Southern-Jarboe.

This prohibited and excluded competition from Boardwalk with the Conspirators, and led to the

Conspirators committing the anti-competitive acts as alleged, which may include otherwise legal

conduct.  These actions are a *per se* violation of Section 1 of the Sherman Act.

57.     The effectuation of the group boycott eliminated Hendershot through Boardwalk from

the wine and spirits markets, and forced him out of business, which damaged him in an amount to be

proven in full at trial, but not less than $22 million, which damages under the Clayton Act should be tripled, and Hendershot should be awarded his attorney fees.

58.     These acts herein alleged constitute a violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Oklahoma Antitrust Reform Act, 79 O.S. § 201 *et seq.* (but for the latter the last sentence of § 50 is omitted).

59.     If a *per se* violation of Section 1 of the Sherman Antitrust Act is not found, then Plaintiff asserts that a rule of reason analysis should apply.

**COUNT 2**
**MONOPOLIZATION OR ATTEMPT TO MONOPOLIZE IN**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT.**

60.     In this Count 2, Plaintiff incorporates by reference, the allegations contained in paragraphs 1 through 58 above, as if fully set forth herein.

61.     Article 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . .

62.     After the passage of 28A, either Southern-Jarboe with its NRS, or Republic-Central with its NRS, conspired and attempted to monopolize the distributor product market for wine or the distributor product market for spirits (liquor), or both markets, in the state of Oklahoma and in any sub-markets as may be discovered.  Such conspiracies are shown by the close relation between each company with its NRS, as each shared the same goal of promoting the Brands committed to either Southern-Jarboe or Republic-Central.  Each pair possessed a strong possibility of succeeding in either or both of the product markets in such effort, because of the Brand control each had, and the domination each had of distribution in the state of Oklahoma.

63.     Alternatively, the Conspirators attempted to monopolize the distributor product market for wine and the distributor product market for spirits (liquor), each in the state of Oklahoma, and in any sub-markets as may be discovered.

64.     These product market are shown to exist for example in Exhibit 2 which is an advertizement of Republic NRS in *Beverage News* of November, 2016, that breaks out wine and spirits separately.  Wine has a completely different manufacturing process from spirits, and the products in each market are largely interchangeable.

65.     Each of the Conspirators had and has a specific intent to monopolize in each of the distributor product markets in Oklahoma as may be inferred by their actions in ¶¶ 35 to 58, above, including the establishment and perpetuation of the illegal group boycott of Boardwalk, and the market power shown in ¶ 49.  Their conduct as alleged was anti-competitive, which may include otherwise legal conduct.

66.     As an alternative, to the attempt to monopolize, on belief, one or the other of Southern-Jarboe or of Republic-Central, possesses a monopoly in each of these product markets as particularly shown in ¶ 49, above, and as may be further shown through discovery.

67.     Through such monopolization that encompassed the alleged group boycott, and attempt to monopolize, Hendershot suffered damages of not less that $23 million and incurred attorney fees, all of which should be trebled.

68.     The acts herein alleged constitute a violation of the Sherman Antitrust Act, U.S.C. § 2, and the Oklahoma Anti Trust Reform Act, 79 O.S. § 201 *et seq.*

WHEREFORE, Hendershot prays that this Court award joint and several damages against the Defendants, that the damages be trebled, that he be awarded his attorney fees, and further relief as the Court may deem just and proper.

s/ Laurence L. Pinkerton
Laurence L. Pinkerton, Esq. (OBA. #7168)
PINKERTON LAW, P.C.
1110 W. 84th St. South
Tulsa, Oklahoma 74132
(918) 587-1800
pf@att.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March, 2021, I electronically transmitted this document to the Court Clerk using the ECF System for filing.  Based on the records currently on file, the Court Clerk will transmit a Notice of Electronic Filing to the ECF registrants on file with the Court Clerk.

s/ Laurence L. Pinkerton
Laurence L. Pinkerton