## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRYAN HENDERSHOT, an individual f/d/b/a BOARDWALK DISTRIBUTION COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-CV-0652-CVE-CDL |
| SOUTHERN GLAZER'S WINE AND SPIRITS OF OKLAHOMA, LLLP d/b/a JARBOE SALES COMPANY; CENTRAL LIQUOR COMPANY, L.P. d/b/a RNDC OKLAHOMA; BEST BRANDS OF DELAWARE, L.L.C. d/b/a REPUBLIC NATIONAL DISTRIBUTING COMPANY; and BRIAN LIDJI, an individual d/b/a SOUTHERN GLAZER'S WINE & SPIRITS OF OKLAHOMA, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court is defendants' joint motion to dismiss (Dkt. # 47) plaintiff Bryan Hendershot's amended complaint (Dkt. # 41) pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff has filed a response (Dkt. # 53), and defendants filed a reply (Dkt. # 54).

### I. BACKGROUND

Plaintiff is the former owner and operator of Boardwalk Distribution Company ("Boardwalk"), a sole proprietorship located in Tulsa, Oklahoma, that distributed wine, spirits, and beer to retailers in Oklahoma. Dkt. # 41, at 1. Plaintiff sold the assets of Boardwalk in mid-2020, but remained obligated to pay Boardwalk's debts. Id. Boardwalk has since ceased operations. Id. In his amended complaint (Dkt. # 41), plaintiff alleges that defendants, horizontal direct competitors

of Boardwalk, conspired successfully to effectuate a group boycott of Boardwalk. Id. As a result, plaintiff states he suffered at least a $22 million loss. Id. at 2. Plaintiff asserts the following in support of that claim:

This case arises from a 2018 amendment to the Oklahoma Constitution: amendment 28A ("28A"). Prior to the passage of 28A, the sale of wine and liquor in Oklahoma operated on a three-tier system involving brands (which produced the wine or liquor), distributors (which purchased a brand's product at wholesale), and retailers (which sold the product to the public). Both in-state and out-of-state brands were permitted to sell their products in the state of Oklahoma to licensed distributors. Licensed distributors were required to be residents of Oklahoma. Oklahoma law required brands to sell their products to all Oklahoma distributors at the same price. Id. at 5. Distributors then sold and distributed those products to retailers. Id. With limited exceptions, retailers were the only entities allowed to sell alcohol to the public. Id.

Distributors that did not qualify as residents of Oklahoma, but that were seeking to sell alcohol in the state (e.g., national distributors), required a nonresident seller (NRS) license. Okla. Stat. tit. 37A, § 2-135 (2020); Okla. Stat. tit. 37, § 524 (2015) (repealed). Such a license, "authorize[d] the holder thereof to solicit and take orders for wine and spirits from the holders of licenses authorized to import the same into this state, and to ship or deliver, or cause to be shipped or delivered, wine and spirits into Oklahoma pursuant to such sales." Okla. Stat. tit. 37A, § 2-135 (2020). Essentially, a nonresident seller acted as a broker for manufacturers by shipping wine or spirits into Oklahoma to be sold by a licensed Oklahoma distributor.

As of January 1, 2014, there were two dominant distributors of wine and spirits in Oklahoma: Central Liquor Company LP ("Central") and Jarboe Sales Company ("Jarboe"). Central and Jarboe

2

both had relationships with national distributors in order to facilitate the sale of out-of-state brands to retailers within Oklahoma. Southern Glazer's Wine and Spirits, Inc. ("Southern Glazer's") worked primarily with Jarboe, and Republic National Distributing Company, LLC ("Republic") worked primarily with Central. Brian Lidjl d/b/a Southern Glazer's Wine & Spirits of Oklahoma was the non-resident seller (NRS) to Jarboe prior to October 1, 2018. Best Brands of Delaware, LLC, d/b/a Republic National Distributing Company was the NRS to Central.

In 2014, a third distributor emerged: Boardwalk. Dkt. # 41, at 5. Plaintiff attributes Boardwalk's ability to compete against the two major distributors to its increased services to retailers. Those services included making daily deliveries to any retailer in the state, and allowing retailers to place orders late in the day. Id. at 5-6. From 2014 to 2017, Boardwalk's sales revenues increased from $22.5 million to $97.6 million. Id. at 6. As Boardwalk realized an increase in sales, the market shares of both Central and Jarboe decreased.

Plaintiff alleges that an owner of Central, Brad Naifeh, acknowledged the increased competition Boardwalk created while having lunch with plaintiff prior to Naifeh's death in June 2018. At that lunch, plaintiff alleges that Naifeh handed him a note stating that if Boardwalk did not scale back delivery times to retailers, Central would lower its prices. Id. Plaintiff alleges that Boardwalk did not adjust its delivery practices after receiving that note, and that Central subsequently lowered its prices. Id. Plaintiff also alleges that, at a lunch in Oklahoma City in 2015, Naifeh told plaintiff that, after changes in the law, Boardwalk "would be reduced to selling beer in Northeast Oklahoma." Id. at 16.

In 2015, Jarboe and Central formed a lobbying and public relations entity referred to as The Institute for Responsible Alcohol Policy ("IRAP") to pursue legislative changes that would benefit

Central, Jarboe, and their respective NRSs.  Id. at 8-9.  That same year, Oklahoma state senator Clark Jolly began to conduct meetings regarding revisions to Article 28 of the Oklahoma Constitution.[1] Id. at 8.  Boardwalk was not invited to participate in those meetings.  Id. at 8.  Naifeh, the primary spokesperson for Central, attended those meetings.  Id.  In one meeting, on May 27, 2015, plaintiff alleges Naifeh stated he wanted Republic to be able to buy into Central, which, at the time, was prohibited by law.  Id.

The result of those legislative discussions was a proposed amendment that eliminated the requirement that brands sell to all distributors who wished to buy product.  Id. at 9-10. Plaintiff alleges that prior to passage of 28A this change was not discussed openly in the legislative halls or outside them.  Id. at 9.[2]  Plaintiff explains that this amendment allowed brands represented by Republic and Southern Glazer's, through their NRSs, to sell exclusively to their respective Oklahoma distributors.  Id. at 11.

The proposed amendment also sought to change the ownership requirements for Oklahoma distributors.  The proposed amendment would allow a corporation, limited liability company, or similar business entity, otherwise prohibited from obtaining a distributor license in Oklahoma, to purchase up to a 50% ownership interest of an Oklahoma distributor.

The amendment was placed on the November 8, 2016 ballot, and it was subsequently passed. As a result, the amendment became effective on October 1, 2018 ("effective date").

---

[1]     Plaintiff alleges that Senator Jolly was allied with Central and Jarboe and acted for their benefit.  However, plaintiff makes no allegations supporting these contentions.

[2]     The Court notes that the proposed amendment does contain the operative language.

4

Plaintiff alleges that, prior to the effective date, some person or entity (presumably defendants or their predecessors) obtained "letter[s] of designation" from brands, "whereby a [b]rand had to designate the entity it would sell to after the [effective date]." Id. at 13.  Plaintiff alleges that "[c]onspirators," worked together to develop these letters "to avoid conflict among them over the nature of the [b]rand commitment, and to assist in the commitment." Id.  Plaintiff alleges that, during these maneuvers, defendants discouraged brands from selling to Boardwalk. Id. at 12-13.

Plaintiff further alleges that this pre-amendment activity allowed defendants to obtain commitments from brands to sell wine and spirits only to Central and Jarboe, respectively. Id. at 12. Plaintiff argues that "[t]he alignment of [b]rands with either Republic-Central or Southern-Jarboe occurred not through competition, but from pre-existing relationships, and from leverage, or tacit leverage, derived from the [n]ational [d]istributors." Id. at 13.  Plaintiff states that "[l]everage also arose because, if the [b]rand did not sell in Oklahoma to Republic-Central or Southern-Jarboe, the [b]rand knew it was exposed to its sales to or through [the corresponding national distributor] in other states being cut back or eliminated." Id. at 14.

On or about the effective date, Southern Glazer's Wines & Spirits, Inc. finalized a purchase of 49% interest in Jarboe.  The purchase resulted in a new entity: Southern Glazer's Wine & Spirits of Oklahoma, LLLP d/b/a Jarboe Sales Company ("Southern-Jarboe").  Also on that day, Republic National Distributing Company LLC finalized a purchase of a 49% interest in Central.  The purchase resulted in a new entity: Central Liquor Company L.P. d/b/a RNDC Oklahoma ("Republic-Central"). Id. at 11.  At that time, Brian Lidjl d/b/a Southern Glazer's Wine & Spirits of Oklahoma became the non-resident seller to Southern-Jarboe and Best Brands of Delaware, LLC, d/b/a Republic National Distributing Company became the nonresident seller to Republic-Central.

Plaintiff states that the focus of the amended complaint is the conspiracy formed "after the passage of 28A" among the defendants. Id. at 12. Plaintiff specifically states the conspiracy was "to maintain and to secure [b]rands for their companies to sell to the exclusion of Boardwalk and to thereby force Boardwalk from competition with them through a group boycott in the distributor markets for wine and spirits in Oklahoma in violation of the Sherman Act, 15 U.S.C. § 1, and to attempt to monopolize, and to monopolize the markets for wine and spirits in Oklahoma in violation of the Sherman Act, 15 U.S.C. § 2." Id. at 12. According to plaintiff, "leverage power existed after passage of 28A, was known by the [c]onspirators to exist, and assured the development of the group boycott." Id. Plaintiff alleges that "the [c]onspirators met together after passage of 28A, and on belief discussed their efforts and sought to achieve an acceptable balance between them on wine and spirits to be represented by each. On belief, these meetings also included assessments of Boardwalk's status with any [b]rands representation." Id. at 13.

Plaintiff further alleges that "[t]o enforce the group boycott, Southern-Jarboe, and on belief, Republic-Central, committed other anticompetitive actions, e.g., a retailer was told that, if he bought from Boardwalk, his delivery days by Southern-Jarboe would be cut back. Further, the [c]onspirators conspired and offered special deals and concessions to grocers to prelude Boardwalk from securing shelf space in their grocery stores." Id. at 16.

Plaintiff states "[t]he group boycott . . .enabled Republic-Central and Southern-Jarboe to control the distribution markets in Oklahoma for wine and for spirits (liquor), or at least 90 percent, or more, of them," and that "Southern-Jarboe and Republic-Central achieved and had a monopoly over distribution of all the top 100 Brands by volume sold in Oklahoma." Id. Plaintiff describes that "Southern-Jarboe is believed to have a monopoly over 14 of the top 25 [b]rands of wine and spirits,

6

and Republic-Central is believed to have a monopoly over the other 11 of the top 25 [b]rands."

Plaintiff contends that after the effective date, defendants have attempted to monopolize the product

markets in Oklahoma, and have the power to do so. Id.

In support of the allegation, plaintiff submits anecdotal evidence of anticompetitive acts.

According to plaintiff:

> A. One high-volume liquor store owner in south Oklahoma City swore under oath that "the two largest wholesalers significantly increased wholesale [prices] for wine and spirits – up by around 18% from before the new law was implemented, according to our numbers." This owner further swore under oath that his deliveries dropped from five days a week to two.

> B: After implementation of 28A an Edmond retailer swore under oath that Central failed to supply two of his best-selling items – McCormick Vodka 80-Proof and Jim Beam – for a period of two weeks. Southern-Jarboe he further swore increased his minimum order charge from $10 dollars for an order under $100 to $30 dollars for an order under $200, for no apparent reason.

> C. An El Reno retailer swore that, because of the monopolistic situation, [Republic-Central and Southern-Jarboe] controlled Route 66 Liquors' livelihood and "could easily put [it] out of business if they so desired."

> D. The situation post 28A's implementation was especially dire for rural retailers, who need consistent and frequent shipments to stay competitive. Shangri-La and Beverage Service operates a resort on Monkey Island near Afton, Oklahoma. It experienced fewer deliveries and lower product availability since 28A was implemented. Southern-Jarboe and Republic-Central are metropolitan-focused and only deliver to Shangri-La once a week, whereas prior to implementation of 28A, Boardwalk was willing to deliver multiple times a week.

> E. In the opposite corner of the state, an Altus liquor store owner swore by affidavit that his customers suffered because of "infrequent deliveries and poor customer service" from the two dominant wholesalers. For top brands, however, neither he nor Shangri-La [has] a choice.

Id. at 17-18.  Plaintiff does not include the sworn statements with his amended complaint.

Plaintiff alleges that the amended complaint demonstrates that defendants have violated 15 U.S.C. §§ 1 and 2.[3]  Plaintiff specifically alleges that defendants have committed a per se violation of § 1, and argues that Southern-Jarboe, or, in the alternative, Republic-Central, is attempting to monopolize the wine or spirits markets in Oklahoma.  Id. at 19-20.

## II. LEGAL STANDARD

"The Court's function on a Rule 12(b)(6) motion is not to weigh the evidence that the parties might present at trial, but to assess whether the plaintiff's complaint is legally sufficient to state a claim for which relief may be granted."  Ramer v. Crain, No. 16-CV-754-JED-FHM, 2019 WL 4602816, at *2 (N.D. Okla. Sept. 23, 2019)[4] (citing Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 757 F.3d 1125, 1135 (10th Cir. 2014)).  To survive a motion to dismiss, a complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Id. at 562.  For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true and must construe the

---

[3]   Plaintiff also alleges that defendants' actions "constitute a violation of . . . the Oklahoma Anti Trust Reform Act," under Okla. Stat. tit. 79, § 201 et seq.  That may be a true statement, if proven, but that does not state a claim for relief.  Plaintiff does not state a separate count or claim based on Oklahoma statutory law.  The Court will not infer one.

[4]   Unpublished decisions are not precedential, but they may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

allegations in the light most favorable to a claimant.  Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002).

A court need not accept as true those allegations that are conclusory in nature.  Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001).  "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).  A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Id.

### III. RESTRAINT OF TRADE

Plaintiff alleges that defendants have violated § 1 of the Sherman Antitrust Act.  Section 1 of title 15 of the United States Code makes "[e]very contract, . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations" illegal. 15 U.S.C. § 1.  "The essence of a claim of violation of [s]ection 1 of the Sherman Act is the agreement itself." Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1082 (10th Cir. 2006). "Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." Id. (quoting  AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 232 (2d Cir.1999)).

In order to state a claim under  § 1, a complaint must present "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556.  "[A]llegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for

defendants' parallel behavior.'" Id. at 552 (citations omitted). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Id. Such an allegation, "without some further factual enhancement, . . . stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" Id. at 557. "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation . . ." Id. (quoting DM Rsch., Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999)). "[W]hen the antitrust claim relies solely on circumstantial facts of parallel behavior, the conspiracy is not plausible if in light of common economic experience the alleged conduct is equally likely to result from independent action." Llacua v. W. Range Ass'n, 930 F.3d 1161, 1175 (10th Cir. 2019). Therefore, to overcome a motion to dismiss, "plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." Apex Oil Co. v. DiMauro, 822 F.2d 246, 253–54 (2d Cir. 1987).

In a viable complaint, "the plaintiff must allege, not only an injury to himself, but an injury to the market as well." Agnew v. Nat'l Collegiate Ath. Ass'n, 683 F.3d 328, 335 (7th Cir. 2012). "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." Jacobs v. Tempur–Pedic Int'l, Inc., 626 F.3d 1327, 1339 (11th Cir. 2010). However, "[t]here are some methods of restraint that are so inherently and facially anti-competitive that an elaborate and burdensome inquiry into a demonstrable economic impact on competition in a relevant market is not required." Total Benefits Plan. Agency, Inc. v. Anthem Blue

10

Cross & Blue Shield, 552 F.3d 430, 434 (6th Cir. 2008) (citing Nat'l Soc'y of Prof'l Eng'rs v. United

States, 435 U.S. 679, 692 (1978)).  These are known as per se violations.  Allegations supporting an

inference of group boycott establish a per se violation of § 1 and do not require the complaint to

allege injury to the market.

A group boycott exists where "[a] group of competitors threaten[] to withhold business from

third parties unless those third parties would help them injure their directly competing rivals."

NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998).   Group boycott can be based on a threat

made by a single competitor if the complaint also alleges "a horizontal agreement among those

threatened . . . to hurt a competitor of the retailer who made the threat."  Id.  The Court must then

necessarily determine whether a horizontal agreement has been adequately alleged.

In their joint motion to dismiss (Dkt. # 47), defendants argue that plaintiff failed to state a

claim under § 1.  Defendants state that plaintiff did not "plausibly allege an agreement in restraint

of trade" and that plaintiff "fails to allege sufficient facts showing an agreement to boycott

Boardwalk."  Dkt. # 47, at 8.  Specifically, defendants note that plaintiff's claim cannot rest on

defendants' efforts to amend the Oklahoma constitution, as such claims are barred by federal law.

Id. at 5.

Plaintiff responds, arguing that paragraphs 5-33 of the amended complaint show "openly

concerted acts," Dkt. # 53, at 14, and that the group boycott is adequately alleged in paragraphs 35-

50.  Id.  Plaintiff argues he satisfies the plus factor description of defendants' actions as "largely

inconsistent with unilateral conduct but largely consistent with explicitly co-ordinated action."  Id.

at 13.  Plaintiff further states that he stands on his allegations on group boycott, as made in paragraph

56 of the amended complaint.  Id.  Plaintiff finally argues that any application of the rule of reason analysis is not applicable in this case.  Id.

### A. Legislative Action

The Court agrees with the defendants that, insofar as paragraphs 5-33 detail the legislative lobbying efforts of defendants and their predecessors, they cannot form the basis of an antitrust violation.  As an initial matter, violations of the antitrust laws cannot be based on defendants' efforts to amend the Oklahoma Constitution. E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135 (1961) ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws."); United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669 (1965); see also City of Columbia v. Omni Outdoor Advert., Inc., 499 U.S. 365, 379–80 (1991) ("The federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government.").  "Private actors are immune from antitrust liability for petitioning the government, even when the private actors' motives are anticompetitive." Sanders v. Brown, 504 F.3d 903, 912 (9th Cir. 2007).  This is the case because"it is inappropriate to base liability on whether a petitioner has an anticompetitive motive, because that would unduly chill speech." Id.  This is referred to as Noerr–Pennington doctrine.  Noerr, 365 U.S. at 135; Pennington, 381 U.S. at 669.  Under this doctrine, defendants also cannot be held liable for injuries caused by the effects of such legislative amendment.  "First Amendment petitioning privileges would indeed be hollow if upon achieving a petitioned-for end the petitioner were then subjected to antitrust liability for his success." Greenwood Utils. Comm'n v. Miss. Power Co., 751 F.2d 1484, 1505 (5th Cir. 1985); see also Sanders, 504 F.3d at 914.

According to the Oklahoma Supreme Court "the plain language of Article 28A, § 2(A)(2) is not in conflict with the anticompetitive provisions of the [Oklahoma] Constitution." Inst. for Responsible Alcohol Pol'y v. State ex rel. Alcoholic Beverage L. Enf't Comm'n, 457 P.3d 1050, 1057 (Okla. 2020) (citing Okla. Const. art. V, § 44 & § 51). Accordingly, business transactions conducted pursuant to and in compliance with 28A do not, in and of themselves, constitute violations of antitrust law. Plaintiff is advised that exclusive contracts with brands are permitted in the post-amendment wine and spirits distribution schemes, and therefore allegations that exclusive contracts are in violation of §§ 1 or 2 of the Sherman Act are without merit.

However, as noted by plaintiff in his response, such immunity extends only as far as the defendant's legislative efforts, i.e., defendants are protected only for their efforts to change the Oklahoma beverage laws to allow exclusive contracts. To the extent plaintiff alleges that, in addition to legislative discussions, there were also anti-competitive discussions or agreements among defendants not to pursue one another's brands, such allegations are not protected by the Noerr-Pennington doctrine. See, e.g., Webb v. Utah Tour Brokers Association, 568 F.2d 670 (10th Cir. 1977).

## B. Parallel Conduct

Although the Court will not consider any allegations that petitioning for 28A is violative of the Sherman Act, plaintiff alleges that other unlawful conduct occurred. The Court now assesses whether such conduct is evidence of an agreement.

Plaintiff asserts that the activities alleged in paragraph 36 require an agreement. Paragraph 36 alleges that "[l]eading up to 28A's implementation on the [effective date], each of Central and Jarboe and their respective NRSs solicited as necessary, and obtained commitments from [b]rands

13

to sell wine and spirits only to Republic-Central, or to Southern-Jarboe, respectively after the [effective date]," and alleges in those efforts that both Central and Jarboe "discourage[d] the opportunity available to the [b]rands under 28A to sell to Boardwalk," when Cental and Jarboe "knew that a commitment from a [b]rand to Central or Jarboe, or to their successor entities, was a foregone conclusion, because of pre-existing sales relations." Dkt. # 41, at 12-13.  Contrary to plaintiff's assertion, those allegations, although more specific than the others to which plaintiff points, do not suggest behavior that would require an agreement.  Those actions do not demonstrate anything other than the natural business practice for each Oklahoma distributor to secure distribution contracts with brands with which a co-owner of each respective Oklahoma distribution company had already established exclusive national deals.  "[N]othing . . . intimates that [this action] was anything more than the natural, unilateral reaction of each [defendant] intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement," as "each [defendant] had reason" to secure their own exclusive deals, "regardless of the other [defendant's] actions."  Twombly, 550 U.S. at  546–47.

Because competitors' conduct of securing exclusive contracts with brands can be legitimate and "unilaterally prompted by common perceptions of the market," a plaintiff must allege "something more than merely parallel behavior."  Id. at 554.  Plaintiff must allege plus factors.

### C. Plus Factors

As stated above, to overcome a motion to dismiss, "plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."  Apex Oil Co. v. DiMauro, 822 F.2d 246, 253–54 (2d Cir. 1987).  Plus factors can include "a common motive to conspire,

evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, [] evidence of a high level of interfirm communications," Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013), (e.g., "whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy,") as well as "product uniformity; [and] whether the defendants have been uniform in their actions." Hyland v. HomeServices of Am., Inc., 771 F.3d 310, 320 (6th Cir. 2014). "[C]ircumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct." Id.

Defendants allege that plaintiff asserts no plus factors. Dkt. # 47, at 10. In response (Dkt. # 53), plaintiff refutes this contention. Dkt. # 53, at 12-13. Plaintiff alleges that certain actions taken by defendants to secure exclusive contracts occurred prior to the effective date, specifically, the concerted acts of drafting letters of designation, along with defendants' meetings to achieve an artificial distribution of competing brands between the distributor defendants, constitute plus factors. Plaintiff also asserts that the allegations of price increases in combination with service cutbacks, and threats to retailers targeting Boardwalk's ability to compete, constitute sufficient allegations of plus factors. Id. at 13-14.

Plaintiff alleges in the amended complaint that defendants met to discuss dividing up brands per distributor; that defendants met frequently while lobbying for 28A and after its passage; and that defendants communicated frequently via an industry group they created (which excluded Boardwalk) during that process. Dkt. # 41, at 8-9. Plaintiff asserts that these allegations are sufficient to indicate a high level of interfirm communications. "Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means

15

and opportunity to conspire." <u>SD3, LLC v. Black & Decker (U.S.) Inc.</u>, 801 F.3d 412, 432 (4th Cir. 2015), <u>as amended on reh'g in part</u> (Oct. 29, 2015).  "Courts have held that a high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."  <u>Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan</u>, 203 F.3d 1028, 1033 (8th Cir. 2000).  In <u>SD3, LLC</u>, plaintiff identified a meeting at which the alleged conspiracy was formed, as well as "phone calls, meetings, and discussions among the various conspirators." 801 F.3d at 432.  Those allegations, the court found, identified "a practice, not illegal in itself, that facilitates [an antitrust conspiracy] that would be difficult for the authorities to detect."  <u>Id.</u>  "Facilitating practices . . . may evidence the plus factors necessary to establish the inference of an agreement."  <u>Id.</u> (quoting Sharon E. Foster, LIBOR Manipulation and Antitrust Allegations, 11 DePaul Bus. & Com. L.J. 291, 304 (2013)).

Here, although plaintiff does not allege the exact meeting at which the alleged conspiracy was formed, plaintiff does allege that there were multiple meetings between defendants from 2015 through 2018 and that during those meetings agreements not to compete with one another, in an effort create advantageous brand contracts and to exclude Boardwalk, were made.  Such allegations are not based on lobbying for the passage of 28A, but rather are based on the simultaenous or subsequent anti-competitive agreement not to compete for brands associated with defendants' respective national distributors.  <u>See, e.g.</u>, <u>In re High-Tech Emp. Antitrust Litig.</u>, 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012) (finding plaintiff successfully alleged that agreements among competitors not to compete for each others' employees were anticompetitive).  As such, they are not barred by <u>Noerr-Pennington</u> and tend to show interfirm communications that establish the inference of an agreement.

Plaintiff also alleges that defendants' conduct of not pursuing contracts with each other's brands constitutes evidence of an agreement in restraint of trade. Dkt. # 53, at 22.  This sort of conduct, without an express agreement, could be factually neutral, as it is the type of conduct that was alleged in Twombly (holding that a competitor's reticence to encroach on a competitor's territory was not evidence of collusion; instead it was the natural tendency of that formerly-monopolistic industry to "sit[] tight, expecting their neighbors to do the same thing." 550 U.S. at 568.)  However, here, plaintiff alleges that the conduct was accompanied by concerted acts to determine which brands would be exclusively sold by which distributor. Dkt. # 41, at 13.  Further, the industry here is different from that in Twombly in that it was not a formerly government-sanctioned monopoly.

Plaintiff also alleges that price increases and simultaneous service cutbacks are indicative of a common motive to conspire.  Dkt. # 53, at 21-22.  Defendants do not offer a common economic rationale that would tend to refute plaintiff's allegation that price increases accompanied by service reductions by one firm should be rationally followed by price increases and service reduction by another firm.  In a competitive market, one would assume that a competitor that was not able to adequately supply a retailer would become disfavored in short order and lose business to the other competitors, especially where other competitors were equipped to fill the demand created by the other distributor.

In reply (Dkt. # 54) to plaintiff's assertion these acts are evidence of a common motive to conspire, defendants assert that price increases (and, presumably, service cutbacks) or attempts to limit Boardwalk's access to shelf space "have nothing to do with the alleged parallel conduct–and thus do not suggest an agreement to boycott Boardwalk."  Dkt. # 54, at 8.  However, these

maneuvers evince a common motive for boycotting Boardwalk.  Defendants' alleged agreement not to compete for one another's brands would leave brands with the choice to either work solely with a distributor with national ties, or to jeopardize that relationship by rejecting the terms offered by that distributor and contract with Boardwalk and/or other smaller distributors.  By artificially eliminating the only other major national distributor from the pool of competing distributors, brands had less leverage to make favorable contracts.  Therefore, defendants arguably agreed to give each other artificially superior positions with brands, and by using those superior positions to push Boardwalk from retail stores, defendants' alleged actions in fact created the power to act in concert to raise prices and decrease service availability, while still maintaining each defendants' respective pre-Boardwalk distribution market share for wine and spirits.

Further, while plaintiff does not expressly point to the structure of the market for wine and spirits as a plus factor, plaintiff does state that defendants overwhelmingly dominate the market he alleged (top 100 brands by volume of both wine and spirits).  "A market in which sales power is concentrated in the hands of the few can also facilitate coercion.  Fewer 'minds' must 'meet' in a concentrated market."  SD3, LLC, 801 F.3d at 432 (finding the defendants' control of 85% of the market as a relevant plus factor).  Here, plaintiff alleges that defendants have control over at least 90% or more of the market for distribution of wine and spirits.  Dkt. # 41, at 16.  Accordingly, the Court finds that the allegations of the concentrated structure of the market constitutes a plus factor.

Some of plaintiff's allegations suffer from a lack of precision regarding exactly who was part of one or more conspiracies at a given time and precisely when agreements were made to pursue the objectives of those conspiracies.  However, the allegations of defendants' parallel conduct of securing exclusive brand contracts, while allegedly agreeing not to compete for each others' brands

(Dkt. # 41, at 13), in conjunction with: i) allegations of high inter-firm communications (specifically the legislative meetings, and the creation of an industry group that excluded Boardwalk, a major competitor) (id. at 8-9); ii) allegations that both firms increased prices and decreased service availability after securing exclusive contracts with brands (id. at 17); iii) allegations that special deals were offered to preclude Boardwalk, and not others, from shelf-space[5] (id. at 16); and iv) the concentrated market structure apparent from the face of the amended complaint, push the conspiracy among defendants alleged in the complaint from possible to plausible.

## IV. MONOPOLIZATION

Plaintiff also alleges that defendants have violated § 2 of the Sherman Antitrust Act, which prohibits attempted monopolization.  15 U.S.C. § 2.[6]  "The offense of monopoly under [section 2] has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

To state a claim, plaintiff must allege: (1) a relevant market, comprised of geographic market and product market components; (2) a dangerous probability of successful monopolization in the relevant market; (3) the specific intent to monopolize the relevant market; and (4) some conduct in

---

[5]     Because the Court finds there is more than one plus factor alleged, the Court finds a conspiracy has been alleged.  As a result, although only one competitor is having been charged expressly with this conduct in the amended complaint, this action was likely taken in furtherance of the attempts to eliminate Boardwalk as a competitor, as part of the conspiracy.

[6]     Section 2 of the Sherman Antitrust Act prohibits "attempt[s] to monopolize ... any part of the trade or commerce among the several States . . . ."

furtherance of the monopolization attempt. United States v. AMR Corp., 335 F.3d 1109, 1113 (10th Cir. 2003); Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 756 (10th Cir. 1999); TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 893 (10th Cir. 1991). If the claim does not adequately allege these elements, it cannot survive dismissal.

In their joint motion to dismiss, defendants argue that plaintiff fails to allege a claim under § 2 for several reasons. Defendants assert plaintiff fails to plead a relevant market or that either Republic-Central or Southern-Jarboe has a monopoly within that market (or is likely to succeed becoming a monopoly). Dkt. # 47, at 7-8. Defendants state that plaintiff also fails to allege facts suggesting that either Southern-Jarboe or Republic-Central engaged in any "exclusionary conduct." Id. Defendants also argue that plaintiff cannot maintain a claim under section 2 against both distributors "because only one firm can be a monopolist." Id. (citing Spectrum Sports, Inc. v. McQuillian, 506 U.S. 447, 454 (1993)).

In response, plaintiff asserts that he has pled all elements of monopoly. Plaintiff asserts he has pled that defendants attempted to monopolize the "distributor product market for wine or the distributor product market for spirits (liquor), or both markets, in the state of Oklahoma and in any sub markets as may be discovered." Dkt. # 53, at 24-25. Plaintiff further notes that "[w]ine has a completely different manufacturing process from spirits, and the products in each separate market are largely interchangeable." Id. at 25. Plaintiff alleges defendants engaged in exclusionary conduct by alleging group boycott. Id. at 26. Finally, plaintiff alleges that his § 2 claim can proceed against bother Republic-Central and Southern-Jarboe in the alternative.

### A. Relevant Market

"An important part of the analysis relates to the definition of the 'relevant market,' which traditionally has two components: the product market and the geographic market." Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 947 F. Supp. 2d 88, 102 (D.D.C. 2013).  "[T]he relevant geographic market must be sufficiently defined so that the Court understands in which part of the country competition is threatened." Id. at 104.  To assert an adequate geographic market, "[t]he area of effective competition . . . must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).

"A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243, 248 (S.D.N.Y. 2000), aff'd, 315 F.3d 101 (2d Cir. 2002) (quoting United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 404 (1956)).  "Products have reasonable interchangeability if consumers treat them as 'acceptable substitutes.'" Id. (citing Federal Trade Comm'n v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 45 (D.D.C. 1998)).  "In order to evaluate whether one product would be an acceptable substitute for another, courts consider whether there exists cross-elasticity of demand and supply of the two products." Id.  "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999).

Plaintiff has alleged a plausible geographic market, Oklahoma, where the markets for both wine and spirits are regulated by state licensing requirements, thus restricting market access to outside competitors.

With respect to the relevant product market, plaintiff asserts that both wine and spirits are interchangeable within their respective markets.  Plaintiff also asserts that "[a]s of the time when statistics were last available, Southern-Jarboe and Republic-Central achieved and had a monopoly over distribution of all the top 100 [b]rands by volume sold in Oklahoma.  More specifically, Southern-Jarboe is believed to have a monopoly over 14 of the top 25 [b]rands of wine and spirits, and Republic-Central is believed to have a monopoly over the other 11 of the top 25 [b]rands." Dkt. # 41, at 16.

In light of the allegations above, the Court finds that plaintiff has not alleged a relevant product market.  To the extent plaintiff seeks to allege a new market in his § 2 claim (i.e., "the top 25 brands"), plaintiff fails to adequately do so.  "The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion." Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir. 1988).  Plaintiff's allegations do not meet that threshold for three main reasons.  First, plaintiff does not specify how "the top 25 brands" were selected (By volume sold or by revenue? Is this nationally or within Oklahoma?).  Next,  plaintiff does not differentiate between the markets for wine and spirits when outlining the above "top 25" breakdown.  Finally, plaintiff's allegations do not explain why he chose the top 25 as a cut off.  As a result, the Court finds the allegations of the "top 25 brands" market are too vague and conclusory to adequately state a relevant market in which either defendant holds a monopoly.

**B. Attempt to Monopolize**

Even ignoring the deficiencies of plaintiff's "top 25" market definition, plaintiff's allegations still fail. Plaintiff alleges that, at most, Southern-Jarboe controls 56% of "top 25" alleged market. "[M]onopolization is rarely found when the defendant's share of the relevant market is below 70%." Exxon Corp. v. Berwick Bay Real Est. Partners, 748 F.2d 937, 940 (5th Cir. 1984); see Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am., 885 F.2d 683, 694 n.18 (10th Cir. 1989). The Court does not find that this is one of the rare instances in which claims of monopoly survive below that threshold. Plaintiff does not allege that either distributor defendant has a growing market share that presents a danger of overtaking competitors. In fact, the allegations in plaintiff's complaint tend to demonstrate that defendants' respective market shares are not likely to change due to the § 1 agreement alleged.

If the Court instead relies on plaintiff's allegation that defendant distributors control 90% of the markets for wine and spirits (sold by volume in Oklahoma), plaintiff's claim still fails. "[T]he market shares of [the defendants] [cannot] not be aggregated to establish an attempt to monopolize." H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1018 (2d Cir. 1989). Therefore, the alleged 90% market share cannot be attributed to either defendant. Further, plaintiff has not alleged that either defendant holds a monopoly over the other (let alone in what proportion), and there is nothing to suggest that one or the other does. In support of this element, plaintiff provides nothing more than blanket allegations that either defendant has exclusive deals with some portion of the top 100 brands by volume in Oklahoma. Dkt. # 53, at 27-28. Such "bare assertions [are] too conclusory to plausibly establish market power in any context." FTC v. Facebook, Inc., No. CV 20-3590 (JEB), 2021 WL 2643627, at *12 (D.D.C. June 28, 2021) (collecting cases). Without

any evidence or allegations that either defendant has a dominant position in the market, plaintiff's claim cannot survive.

**IT IS THEREFORE ORDERED** that defendants' joint motion to dismiss (Dkt. # 47) is **denied** as to count 1, and **granted** as to count 2.  Count 2 is hereby **dismissed**.

**DATED** this 9th day of August, 2021.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE